**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3315-24

G.G.S.,

     Plaintiff-Appellant,

v.

A.C.B.,

     Defendant-Respondent.

_____

**APPROVED FOR PUBLICATION**

**May 5, 2026**

**APPELLATE DIVISION**

Submitted January 27, 2026 – Decided May 5, 2026

Before Judges Sumners, Susswein and Augostini.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FV-04-2724-25.

Donelson, D'Alessandro & Peterson, LLC, attorneys for appellant (Linwood H. Donelson III and Keith A. Peterson, on the brief).

Respondent has not filed a brief.

The opinion of the court was delivered by

SUSSWEIN, J.A.D.

This appeal raises important questions under the New Jersey Prevention of Domestic Violence Act (PDVA), N.J.S.A. 2C:25-17 to -35, when the

predicate act of domestic violence involves egregious physical force—in this instance, an acquaintance rape[1] involving manual strangulation.  We address, for example, the tension that can arise between two important principles that inform the decision on whether to issue a final restraining order (FRO) under the PDVA:  first, that the trial court must consider whether the predicate act was part of a pattern of historical domestic violence involving the parties; and second, that the need for an FRO is often "perfunctory and self-evident" when the predicate act involves physical violence, especially when the unlawful force is severe.

In this instance, we accord greater significance to the egregiousness of the physical force inflicted upon the victim than to the fact that there was no history of past acts of domestic violence between the parties.  The forcible date rape, in other words, was sufficiently egregious to warrant an FRO notwithstanding that it was the first and only act of domestic violence defendant perpetrated against the victim.  We add that the sexual violence committed in this case constitutes an archetypical example of the degree of

---

[1]  In State in Interest of M.T.S., our Supreme Court explained that this type of nonconsensual sexual assault "is often referred to as 'acquaintance rape.'"  129 N.J. 422, 425 (1992).  The term "date rape" is also used in common parlance to describe a forcible sexual assault committed against a person with whom the actor has a dating relationship.

A-3315-24

coercive control and domination that triggers the PDVA's protections.  We likewise consider strangulation to be an act of control and domination that by itself will often justify the entry of an FRO even when it does not result in serious or significant bodily injury.

Aside from addressing the legal impact of the egregiousness of the physical force that was inflicted upon the victim in this case, we also consider the "immediacy" of future harm that must be shown to warrant an FRO. Although a plaintiff seeking an FRO under the PDVA must establish the need for protection from further abuse, the foreseeable abuse need not be imminent and the risk of it coming to fruition should be assessed in the context of considering the victim's best interests.  The best-interests-of-the-victim factor is an important consideration, one that must be applied as part of a comprehensive statutory framework designed to afford domestic violence victims the maximum protection from abuse the law can provide.  In cases like this one where future contact between the parties is foreseeable, a victim of extreme physical violence has a right to be assured that the assailant's conduct during any future encounter will be constrained by the terms of an enforceable judicial order—one that can be presented to police if needed—and not just an informal oral warning from the judge as occurred in this case.

3

Plaintiff, G.G.S.,[2] appeals a May 19, 2025, Family Part order dismissing a temporary restraining order (TRO) against defendant, A.C.B., and denying plaintiff's request for an FRO against him. The parties had a one-week dating relationship that ended abruptly when defendant overpowered and sexually penetrated plaintiff despite her repeated protests. While pinning plaintiff down, defendant placed his hands on her neck, impairing her ability to breathe.

The trial court credited plaintiff's testimony, finding there was a dating relationship, that defendant committed the predicate act of sexual assault, and that he placed his hands on plaintiff's neck four or five times, affecting her breathing. The court described the violent episode as "despicable." It also noted that defendant had "predatory tendencies" and found plaintiff's testimony credible, stating, "I think she's scared, I think she's legitimate."

The court nonetheless concluded that plaintiff had not established the grounds for an FRO, holding that plaintiff had not demonstrated that an FRO was necessary to protect her from "immediate danger." In reaching that conclusion, the court relied on the lack of a previous history of domestic violence between the parties. The court also commented, "I think that

---

[2]  We use initials to protect the confidentiality of the victim in these proceedings. R. 1:38-3(d)(10).

[defendant] understands that that's not the kind of conduct of how a man should treat a woman."

Despite denying plaintiff's request for an FRO, the court at the conclusion of the hearing admonished defendant to stay away from plaintiff, telling him, "You understand that when you see her around in the fall, you're going to turn the other way. You're not to talk to her. You're not to look at her. You're not to do anything." The court added, "Do you understand the break you got today?"

We believe that the trial court's colloquy with defendant at the end of the hearing contradicts its ruling that an FRO was not needed to protect the victim. Its final remark suggesting defendant was given a "break," moreover, disregards the interests of the victim and thus runs afoul of the letter and spirit of the PDVA. Although we generally defer to Family Part judges, on these disturbing facts we are constrained to reverse and remand for entry of an FRO.

I.

FACTS AND PROCEDURAL HISTORY

We discern the following facts and procedural history from the record. The parties, both college students, were introduced by a mutual friend on February 26, 2025. Their first date was on March 1. A second date took place

A-3315-24

on March 4, when the parties went bowling and then returned to defendant's parents' house, where he lived at the time.

That night, the parties "made out" on defendant's bed. Plaintiff told defendant that she did not intend to "sleep with" him because she was practicing celibacy. Defendant repeatedly asked plaintiff why she would not have sex with him and pressured her to reconsider. Plaintiff testified that on that night, she told defendant "no" approximately seventeen times.

Defendant apologized for his behavior by text later that night. Plaintiff replied the following day, letting defendant know that she felt uncomfortable about the night before. Defendant replied that he "fe[lt] like an asshole" and was "sorry for what [he] did." After the parties' mutual friend convinced plaintiff to give defendant another chance, plaintiff agreed to meet defendant at a public park the next day, March 6.

At that meeting, plaintiff reiterated that defendant's conduct during the second date made her uncomfortable and she reaffirmed that she was practicing celibacy. Defendant was understanding, and plaintiff agreed to go out with him a third time the following evening.

At around 10:30 p.m. on March 7, defendant picked plaintiff up from her home for a third date. Plaintiff wore "granny panties" and "baggy pajamas," which, she explained at trial, was deliberate to underscore that she did not

6

intend to have sexual intercourse with defendant. The parties went to defendant's parents' house, and plaintiff lay down to go to sleep, as she had to be at work at 6:00 a.m. the next morning. Defendant became angry that plaintiff "just came there to sleep," and after he protested, she agreed to watch a movie.

Defendant began to pressure plaintiff to have sex with him, stating that plaintiff "owed him" for their previous dates and that she should "ask [her] friends what they do for . . . their partners." Plaintiff reiterated seven to ten times that she did not want to have sex.

Eventually, plaintiff and defendant began "making out" on defendant's bed. Plaintiff took off defendant's shirt, and defendant took off plaintiff's shirt and bra. Defendant tried to take off plaintiff's pants and underwear, but she said no and reasserted that she did not want to have sexual intercourse. Defendant took them off anyway, held plaintiff down by her shoulders, and penetrated her. Defendant also pressed down "very hard" on plaintiff's neck so that she had a "slightly" hard time breathing. Plaintiff told defendant "no" multiple times as she was being sexually assaulted. Defendant continued to penetrate her for approximately three minutes, then ejaculated on her leg before letting her up.

7

Defendant drove plaintiff home that night and told her "he felt like he did something bad."

On March 10 or 11, <u>defendant</u> filed a police report in which he claimed that plaintiff reached toward his genitals.[3]

On March 11, plaintiff applied for and was granted a TRO against defendant. On April 3, she amended her complaint to include additional details about the sexual assault incident and the events leading up to it.

A bench trial was held over the course of two days in April and May. In addition to describing the sexual assault, plaintiff testified about her potential future contact with defendant. She explained that starting in the fall, she would be enrolled at the same college as defendant and would be attending classes in either the same or adjacent classroom buildings. She expressed concern that she would run into defendant as there are "too many common places." Plaintiff further testified that the parties have mutual acquaintances and similar social circles.

---

[3] The record on appeal does not indicate what police did in response to defendant's report or whether plaintiff was aware of it when she applied for a TRO. However, as of the May 19, 2025 hearing, defendant was aware of a "pending" criminal investigation against him related to the incident, although no charges had yet been filed. The record does not indicate whether criminal charges were ever filed against either party.

Plaintiff also expressed concern that defendant could come to her workplace, testifying:

> A: My job has no security and is a very, very busy [convenience store]. And we've gotten robbed before. I work every type of shift. And, sometimes, there's just little to no staff there. . . .
>
> Q: Has this defendant ever shown up at this [convenience store]?
>
> A: I have no clue.
>
> . . . .
>
> Q: Does he know where it is?
>
> A: Well, he does from the restraining order, I think.
>
> . . . .
>
> Q: How about prior to the first week of March? Did he know?
>
> A: I think I've told him where I worked. I'm not sure.

Plaintiff, who plays softball, also testified that defendant "shadows [her] athletic trainer" and that she "couldn't even go to" her remaining softball games "because [she] knew he was going to be there and . . . just didn't feel safe." Finally, she noted that defendant knows where she lives.

At trial, defendant denied that he held plaintiff down, penetrated her, or strangled her. He claimed that he fell asleep in his gaming chair and awoke to plaintiff touching him.

9

II.

TRIAL COURT RULING

Following the parties' testimony, the trial court rendered an oral opinion.

It found that plaintiff was "inherently believable" and "more credible" than

defendant. Specifically, the court credited her testimony that

> [defendant] took off both [her] shirts and held her
> down by her shoulders and later placed [his] hands . . .
> on her neck. And that it did affect her breathing. And
> that he did that four or five times.

The court thereupon held that plaintiff proved by a preponderance of the

evidence that defendant committed the predicate act of sexual assault. See

N.J.S.A. 2C:25-19(a)(7), N.J.S.A. 2C:14-2. Specifically, the court found that

defendant committed "an act of sexual penetration" and used "physical force or

coercion, but the victim [did] not sustain severe personal injury," in violation

of N.J.S.A. 2C:14-2(c)(1).[4] The court also addressed defendant's alleged

strangulation of plaintiff, noting it was "very concerned about that because our

[L]egislature amended the aggravated assault statute in . . . 2021 to make that

---

[4] We note the trial court appears to have mistakenly applied a version of the sexual assault statute predating amendments made in 2020. The pre-amendment statute required that an actor "uses physical force or coercion." N.J.S.A. 2C:14-2(c)(1) (2019). The revised statute instead requires that the actor "commits the act using coercion or without the victim's affirmative and freely-given permission." N.J.S.A. 2C:14-2(c)(1).

kind of allegation a second degree crime." See N.J.S.A. 2C:12-1(b)(13); L. 2021, c. 172, § 1. However, the court made no further determination as to whether, in addition to sexual assault, defendant also committed the predicate act of assault.[5] See N.J.S.A. 2C:25-19(a)(2); N.J.S.A. 2C:12-1.

Turning to the second part of the Silver[6] test, the court noted that the parties live in different towns. The court acknowledged plaintiff's "particular fear in regards to this particular matter" and "the fact that she worked at a [convenience store] and [defendant] knew that." The court found, however, that the parties had no "previous history" before their "one-week relationship."

The court also found that defendant "knew something had happened" and that his text messages after the second date expressed that he was sorry. The court concluded:

> [T]he fact that [plaintiff is] now going to transfer to the college that [defendant attends] . . . I do not think that she met the second prong. I think [she] absolutely proved the case in regards to the assault. I think that he understands that that's not the kind of conduct of how a man should treat a woman, and that he clearly had predatory tendencies.

---

[5] We note that on her initial and amended TRO complaint, plaintiff checked the boxes for both "Sexual Assault" and "Assault" in the section alleging defendant's criminal offenses.

[6] Silver v. Silver, 387 N.J. Super. 112 (App. Div. 2006).

In regards to issuing the final order . . . I need to see immediate danger, realizing that I think she was credible when she talked about strangulation. . . . I think [what he did was] despicable.

. . . .

. . . [W]hile I . . . think [plaintiff is] scared, I think she's legitimate, I don't think she showed me the legal burden of proof for me to issue the order.

The court thereupon declined to issue an FRO and dismissed the TRO.

The court then addressed defendant, stating:

[Court]: You understand that when you see her around in the fall, you're going to turn the other way. You're not to talk to her. You're not to look at her. You're not to do anything. Do you understand that?

[Defendant]: Yes, sir.

[Court]: Do you understand the break you got today?

[Defendant]: Yes, sir.

This appeal follows. Plaintiff contends the trial court erred in failing to find the need for an FRO and that she is entitled to an FRO as a matter of law. She argues that "the continuing probability of contacts between the [p]arties makes a finding of ongoing need perfunctory and self-evident especially considering that the [c]ourt felt the need to warn [defendant] about future contact." Plaintiff further asserts that "sexual assault with strangulation is

such an egregious single act, that a victim should be entitled to an [FRO] as a matter of law in all but the most unique of circumstances."

III.

GENERAL LEGAL PRINCPLES

We begin our analysis by canvassing some of the general legal principles that guide us, starting with an acknowledgment that the scope of our review is constrained by the deference we accord to Family Part judges in domestic violence cases. As a general matter, "findings by a trial court are binding on appeal when supported by adequate, substantial, credible evidence." Gnall v. Gnall, 222 N.J. 414, 428 (2015). "We accord substantial deference to Family Part judges, who routinely hear domestic violence cases and are 'specially trained to detect the difference between domestic violence and more ordinary differences that arise between couples.'" C.C. v. J.A.H., 463 N.J. Super. 419, 428 (App. Div. 2020) (quoting J.D. v. M.D.F., 207 N.J. 458, 482 (2011)). "[D]eference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" MacKinnon v. MacKinnon, 191 N.J. 240, 254 (2007) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)). Accordingly, we will not disturb a trial court's factual findings unless "'they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Cesare,

13

154 N.J. at 412 (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co. of Am., 65 N.J. 474, 484 (1974)).

However, we do not accord deference to legal conclusions, such as interpretations of a statute, which we review de novo. See C.R. v. M.T. (C.R. II), 257 N.J. 126, 139 (2024); see also Thieme v. Aucoin-Thieme, 227 N.J. 269, 283 (2016) (noting appellate courts owe no special deference to a trial court's "interpretation of the law" (quoting D.W. v. R.W., 212 N.J. 232, 245 (2012))).

Although the PDVA is codified in chapter 25 of the New Jersey Code of Criminal Justice (penal code), N.J.S.A. 2C:1-1 to 2C:104-9, it does not impose punishment but rather authorizes civil complaints brought by private plaintiffs applying the preponderance-of-the-evidence standard of proof, as distinct from criminal actions brought by prosecutors applying the much higher proof-beyond-a-reasonable-doubt standard. Given its placement in the penal code, the PDVA incorporates by reference certain other provisions of Title 2C. The listed predicate acts set forth in N.J.S.A. 2C:25-19(a), for example, are indictable crimes and disorderly and petty disorderly persons offenses defined in subtitle 2 (chapters 11-41) of the penal code. These substantive offenses, in turn, are assigned degree classifications for sentencing purposes, grading their comparative seriousness. See N.J.S.A. 2C:43-1. Some crimes designated as

14

domestic violence predicate acts, moreover, may be subject to special sentencing enhancements, such as the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. These criminal sentencing features indicate the Legislature's rating of the relative seriousness of the offense conduct, which, as we explain, is a relevant consideration in PDVA civil actions, not just criminal prosecutions.

The PDVA explicitly states that one of its core purposes is to "assure the victims of domestic violence the maximum protection from abuse the law can provide." G.M. v. C.V., 453 N.J. Super. 1, 12 (App. Div. 2018) (quoting State v. Brown, 394 N.J. Super. 492, 504 (App. Div. 2007) (quoting N.J.S.A. 2C:25-18)). Stated another way, "[o]ur law is particularly solicitous of victims of domestic violence," M.D.F., 207 N.J. at 473 (alteration in original) (quoting State v. Hoffman, 149 N.J. 564, 584 (1997)), and courts will "liberally construe[] [the PDVA] to achieve its salutary purposes." Cesare, 154 N.J. at 400.

The PDVA applies to adults who have some form of domestic relationship as specified in the statute. See N.J.S.A. 2C:25-19. It defines a "[v]ictim of domestic violence" to include, for example, "any person who has been subjected to domestic violence by a person with whom the victim has had a dating relationship." N.J.S.A. 2C:25-19(d) (emphasis added). The emphasized text makes clear that the authority to issue an FRO does not

depend on whether the dating relationship is ongoing. In other words, the plain language of the PDVA provides unequivocally that a court may issue an FRO notwithstanding that the dating relationship has since been irrevocably terminated. Here, defendant does not dispute that he and plaintiff were in a dating relationship that started before the predicate act of domestic violence.

When determining whether to grant an FRO pursuant to the PDVA, the trial court must make two sequential determinations. See Silver, 387 N.J. Super. at 125-27. First, the court must determine whether the plaintiff has proved by a preponderance of the evidence that "one or more of the predicate acts set forth in N.J.S.A. 2C:25-19(a) has occurred." Id. at 125. This entails finding that the plaintiff has proved all of the elements of the applicable offense(s) as defined in the penal code. This stage is roughly analogous to the guilt phase of a criminal proceeding.

If the plaintiff has satisfied the first prong, the court must next determine whether an FRO is necessary to protect the plaintiff from "immediate danger or to prevent further abuse." Id. at 127. In other words, the second inquiry under the Silver analytical paradigm "is whether the court should enter a restraining order that provides protection for the victim." Id. at 126. This second stage is roughly analogous to the penalty/sentencing phase of a

criminal prosecution, although we do not mean to suggest that an FRO under the PDVA is punitive as distinct from remedial and preventative.

We emphasized in Silver that "the commission of any one of the predicate acts enumerated in [the PDVA] does not automatically warrant issuance of a domestic violence restraining order." Id. at 124. In R.G. v. R.G., we reaffirmed that principle, explaining that "the trial court must find a predicate offense and also find a basis, upon the history of the parties' relationship, to conclude the safety of the victim is threatened and a restraining order is necessary to prevent further danger to person or property." 449 N.J. Super. 208, 224 (App. Div. 2017); see also Corrente v. Corrente, 281 N.J. Super. 243, 248 (App. Div. 1995) ("[T]he drafters of the law did not intend that the commission of any one of these acts automatically would warrant the issuance of a domestic violence order."). In other words, with respect to the decision on whether to issue an FRO, there is no counterpart in the PDVA to the "mandatory" or even "presumptive" prison sentences that are sometimes prescribed under the criminal provisions of the penal code. See e.g., N.J.S.A. 2C:44-1(d) (establishing a strict presumption of imprisonment when a person is convicted of a first or second-degree crime or certain other offenses). However, the PDVA does generally provide that once the decision is made to

17 <span>A-3315-24</span>

enter an FRO, that order must include relief to prevent further abuse. N.J.S.A.

2C:25-29(b).

We explained in Silver:

> Although this second determination—whether a
> domestic violence restraining order should be issued—
> is most often perfunctory and self-evident, the guiding
> standard is whether a restraining order is necessary,
> upon an evaluation of the factors set forth in N.J.S.A.
> 2C:25-29(a)(1) to -29(a)(6), to protect the victim from
> an immediate danger or to prevent further abuse. See
> N.J.S.A. 2C:25-29(b) (stating that "[i]n proceedings in
> which complaints for restraining orders have been
> filed, the court shall grant any relief necessary to
> prevent further abuse") ([e]mphasis added).
>
> [387 N.J. Super. at 127.]

The non-exhaustive[7] list of relevant factors codified in N.J.S.A. 2C:25-

29(a)(1) to -29(a)(7)[8] are as follows:

---

[7] The preface to the list of factors expressly provides that "[i]n considering the necessity of a restraining order the court shall consider but not be limited to the following factors." N.J.S.A. 2C:25-29(a) (emphasis added).

[8] Effective January 8, 2024, the PDVA was amended to include a "pattern coercive control" among the statutory factors courts must consider when determining whether to issue an FRO. N.J.S.A. 2C:25-29(a)(7); L. 2023, c. 230, § 1. We note that our courts have long recognized that a pattern of controlling behavior is a dangerous form of domestic violence that threatens the safety of those subjected to it. See Cesare, 154 N.J. at 397 (describing domestic violence as a "pattern of abusive and controlling behavior injurious to its victims" (quoting Peranio v. Peranio, 280 N.J. Super. 47, 52 (App. Div. 1995))).

(1) The previous history of domestic violence between the plaintiff and defendant, including threats, harassment and physical abuse;

(2) The existence of immediate danger to person or property;

(3) The financial circumstances of the plaintiff and defendant;

(4) The best interests of the victim and any child;

(5) In determining custody and parenting time the protection of the victim's safety;

(6) The existence of a verifiable order of protection from another jurisdiction; and

(7) Any pattern of coercive control against a person that in purpose or effect unreasonably interferes with, threatens, or exploits a person's liberty, freedom, bodily integrity, or human rights with the court specifically considering evidence of the need for protection from immediate danger or the prevention of further abuse.

The second step under Silver also "requires the conduct must be imbued by a desire to abuse or control the victim." R.G., 449 N.J. Super. at 228 (citing Silver, 387 N.J. Super. at 126-27). Coercive control, we emphasize, is a common if not ubiquitous characteristic of domestic violence and often signals the need for the protection afforded to victims under the PDVA. See Silver, 387 N.J. Super. at 128 (describing a "pattern of abusive and controlling

19

behavior" as a "classic characteristic of domestic violence") (citing Cesare, 154 N.J. at 397-98).

We find further general guidance on how to apply the second step of the Silver paradigm by looking at the Sexual Assault Survivor Protection Act of 2015 (SASPA), N.J.S.A. 2C:14-13 to -21—a complementary statute that authorizes civil restraining orders in cases involving sexual crimes where there is no domestic relationship between the sexual offender and the victim. In C.R. II, our Supreme Court recently explained that SASPA allows survivors of sexual assault who are ineligible for a restraining order under the PDVA to seek a temporary protective order (TPO) and final protective order (FPO). 257 N.J. at 140. The Court offered the example of a victim who is subjected to sexual violence by someone with whom they have "less than a dating relationship," and who is thus ineligible for an FRO under the PDVA. Id. at 141 (quoting R.L.U. v. J.P., 457 N.J. Super. 129, 135 (App. Div. 2018)). The Court noted that SASPA was intended to "fill this void." Ibid. (quoting R.L.U., 457 N.J. Super. at 135).

The Court further noted that "[a]s a complement to the PDVA, SASPA mirrors the PDVA in certain respects, and diverges from it in others." Id. at 143. The Court then focused on one of the differences between the two statutes, highlighting that SASPA lists only two factors that the trial court

A-3315-24

must consider, whereas the PDVA codifies a non-exhaustive list of (now) seven factors that must be considered.[9] Id. at 143-44.  More specifically, the Court focused on the provision in SASPA that requires a trial court to consider "the possibility of future risk to the safety or well-being of the alleged victim," N.J.S.A. 2C:14-16(a)(2).  The Court compared that statutory language with the factor in the PDVA that requires courts to consider "[t]he existence of immediate danger to person or property," N.J.S.A. 2C:25-29(a)(2).  Id. at 143-44.[10]

---

[9]  We note that five of the (now) seven enumerated FRO factors in the PDVA suggest a past or ongoing relationship between the parties and thus would likely have no applicability in the context of SASPA.  These are:  factor one (the previous history of domestic violence between the parties); factor three (the financial circumstances of the plaintiff and defendant, suggesting some form of financial interdependence); factor five (custody and parenting time considerations, indicating the parties have one or more children in common); factor six (an order of protection from another jurisdiction, presupposing past domestic violence between the parties); and factor seven (a pattern of coercive control, suggesting a past relationship between the parties).  N.J.S.A. 2C:25-29(a)(1) to -29(a)(7).

[10]  We note that Justice Fasciale in a concurring opinion disagreed that SASPA requires victims to speculate about the "possibility of future risk to [their] safety or well-being."  Id. at 153-54 (Fasciale, J., concurring).  In his view, under SASPA, once a victim proves by a preponderance of the evidence that a defendant committed a predicate sexual act, the victim is automatically entitled to an FPO prohibiting the assailant from contacting the victim and committing further predicate acts.  Id. at 154.

Construing the formulation found in SASPA, the Court explained that "[t]he plain language of factor two thus requires a court to consider whether there is a chance that a survivor may be exposed to physical danger, risk, or injury, or may be exposed to something emotionally unwelcome or unpleasant that could make them feel uncomfortable, unhealthy, or unhappy." Id. at 146. The Court characterized the SASPA formulation as a "permissive" and "lenient" standard that is "easily satisfied." Id. at 145, 146.

Of note for purposes of the matter before us, the Court compared the text of the second SASPA factor with the text of the second FRO factor in the PDVA, reasoning that the Legislature's decision to use different formulations was deliberate and meaningful. Id. at 147.

We do not read C.R. II to suggest that the PDVA's second factor is onerous, only that it is different from and not as easily satisfied as the corresponding SASPA factor.[11] While described by the C.R. II Court as complementary, id. at 143, there are structural differences between the two statutes that might explain why the Legislature in SASPA did not copy the PDVA FRO factors that do not presuppose a domestic relationship. See note 9. For example, the PDVA covers a much wider range of offenses than

_____

[11] In reaching this conclusion, the Court in C.R. II also noted that the consequences to a defendant of a PDVA FRO "can be far more severe" than those of a SASPA FPO. Id. at 144.

SASPA; it is by no means limited to sexual offenses. It also bears noting that while some PDVA predicate acts constitute very serious crimes, including homicide, kidnapping, and aggravated sexual assault, one of the most commonly cited predicate acts, harassment, is generally graded as a petty disorderly persons offense. See N.J.S.A. 2C:33-4. As we explain, we believe that as a general proposition, to ensure proportionality in effectuating the protective goals of the PDVA, the greater the level of violence that is proven, the easier it is for a plaintiff to satisfy the second prong of the Silver analytical paradigm. Indeed, that is exactly what the perfunctory-and-self-evident principle accomplishes.

Accordingly, although the proofs needed for an FRO under the PDVA may be more rigorous than the proofs needed for an FPO under SASPA, we do not believe that the PDVA sets a high bar for domestic violence victims who have already proved by a preponderance of the evidence that they were subjected to egregious physical violence during a dating relationship. To suggest otherwise would conflict with the long-established perfunctory-and-self-evident principle, let alone the PDVA's explicit policy statement that the Legislature intended to provide domestic violence victims the "maximum protection from abuse the law can provide." N.J.S.A. 2C:25-18.

IV.

23

## RECONCILING POTENTIALLY COMPETING LEGAL PRINCIPLES

We next apply the foregoing legal principles to the present facts. We begin by reconciling two PDVA features that can lead to different outcomes: the notion on the one hand that courts must consider whether there was a pattern of domestic violence or whether instead the predicate act was isolated and aberrational, and, on the other hand, the notion that some predicate acts by their inherent nature warrant an FRO even in the absence of past domestic violence involving the parties.

As a general matter, the absence of a pattern of past domestic violence weighs against the need for an FRO. The case law nonetheless makes clear that while past domestic violence is a relevant factor, indeed one that is explicitly codified in the PDVA, it is not a material element that must be proved in all cases as a categorical prerequisite to an FRO. In <u>Cesare</u>, our Supreme Court explained that "[a]lthough a court is <u>not obligated to find</u> a past history of abuse before determining that an act of domestic violence has been committed in a particular situation, a court must at least <u>consider</u> that factor in the course of its analysis." 154 N.J. at 402 (emphasis in original). The Court added that "one sufficiently egregious" action may constitute domestic violence under the PDVA. <u>Ibid.</u>

In Silver, we embraced and expounded upon those principles, applying them not just to the decision on whether a predicate act of domestic violence was committed, but also to the secondary question of whether an FRO is needed. We explained,

> Although it is clear that a pattern of abusive and controlling behavior is a classic characteristic of domestic violence, see [Cesare,154 N.J. at 397-98], the need for an order of protection upon the commission of a predicate act of "domestic violence," as specifically defined in [the PDVA], may arise even in the absence of such a pattern where there is "one sufficiently egregious action[.]" Id. at 402.
>
> [387 N.J. Super. at 128 (third alteration in original).]

See also J.A.H, 463 N.J. Super. at 434 (recognizing that a history of domestic violence is only "one of six non-exhaustive factors judges must consider when evaluating whether an FRO is necessary for a plaintiff's protection").

The recognition that a single "sufficiently egregious action" can suffice to grant an FRO is an important feature of our domestic violence jurisprudence—one designed to ensure that victims of physical violence receive the maximum protection the PDVA can provide. See N.J.S.A. 2C:25-18. In A.M.C. v. P.B., we applied this precept, explaining that "[w]hen the predicate act is an offense that inherently involves the use of physical force and violence, the decision to issue an FRO 'is most often perfunctory and self-evident.'" 447 N.J. Super. 402, 417 (App. Div. 2016) (quoting Silver, 387 N.J.

25

Super. at 127). <u>See also</u> <u>S.K. v. J.H.</u>, 426 N.J. Super. 230, 233 (App. Div. 2012) (commenting that an attack that left the victim with severe bruises, fractures in her orbital bone and jaw, cuts requiring stitches, and a lung injury was "a predicate act of such severity and viciousness that the need for a restraining order . . . was 'perfunctory and self-evident'" (quoting <u>Silver</u>, 387 N.J. Super. at 127)).

The "one sufficiently egregious action" principle helps to ensure a proportionate response to each domestic violence situation, recognizing that the same basic remedy—an FRO with all of its potentially "severe" consequences, <u>C.R. II</u>, 257 N.J. at 144—applies to a wide spectrum of unlawful conduct, ranging from petty disorderly persons offenses to first-degree crimes. While such a remedy may be entirely appropriate, indeed necessary, for a single offense involving serious physical violence like the second-degree NERA crime in this case, it might be inappropriate for a less serious predicate act, such as one graded under the penal code as a petty disorderly persons offense, absent evidence that the present predicate act was part of a pattern of repetitive conduct. In cases involving less serious predicate acts, in other words, it is the pattern of domestic violence, not its latest iteration viewed in isolation, that may justify an FRO with all its attendant consequences.

That said, neither the "one sufficiently egregious action" principle nor the "perfunctory and self-evident" principle supplants the need to consider the statutory factors set forth in N.J.S.A. 2C:25-29(a)(1) to (7). The point, rather, is that the non-exhaustive FRO factors enumerated in N.J.S.A. 2C:25-29(a)(1) to (7) should be viewed in conjunction with these principles, which apply when the predicate act involves physical force and violence, and especially when that force and violence is egregious.

To be clear, we do not mean to suggest a bright-line, categorical rule whereby a finding that a defendant committed an especially serious predicate crime automatically requires the issuance of an FRO. As we have noted, there are no "mandatory" FROs under the PDVA, in stark contrast to the myriad of mandatory sentences that must be imposed upon conviction under the criminal provisions of the penal code. Furthermore, in assessing the risk of future domestic violence between the parties, courts must make a case-sensitive assessment of the likelihood that the parties will have future interactions that might provide an opportunity or incentive for further victimization.

Stated another way, the egregiousness of the predicate act of physical domestic violence does not shift the ultimate burden of persuasion regarding the decision on whether to issue an FRO but rather is an important consideration in deciding whether a plaintiff has satisfied their burden under

the second prong of the <u>Silver</u> two-part paradigm. The greater the level of egregiousness, the greater the need to invoke the protections of an FRO.

Applying these principles to the present facts, we conclude the absence of any prior history of domestic violence between the parties has little bearing on the victim's need for protection, considering that the dating relationship that establishes jurisdiction under the PDVA began only shortly before the commission of the predicate act. The fact that one of the earliest interactions between parties in a new dating relationship takes the form of a forcible rape hardly militates against the need for a stay-away/no-contact order when, as here, there are reasons to believe that there may be future encounters between the parties.[12]

We appreciate that as a general matter, past acts of domestic violence can provide a benchmark for determining, for example, whether the level of discord in a tumultuous relationship is escalating. Past acts, in other words, may not only indicate a likelihood that domestic violence will recur but also reveal a trend that foreshadows even more serious violence unless the pattern is interrupted by an FRO. But here, there is no need for any such benchmark from which to predict an escalation, for example, from verbal abuse or

---

[12] We further note that, even before the sexual assault, there was a pattern of pressure by defendant for plaintiff to have sex with him.

property damage to a physical attack, because the present predicate act already involves physical and sexual violence.

It would make little sense, moreover, to interpret the PDVA so strictly as to deny protection to plaintiff on the present facts considering that she would almost certainly be entitled to a SASPA FPO if the same egregious sexual assault/strangulation happened to occur at the parties' first meeting, if that was found to be "less than a dating relationship." See C.R. II, 257 N.J. at 141 (quoting R.L.U., 457 N.J. Super. at 135). Here, the sexual assault victim is not less vulnerable to further abuse because there happened to be a brief domestic relationship between the parties that provides jurisdiction under the PDVA but forecloses relief under SASPA.

Finally, we add that when the sexual abuse is especially egregious or "despicable," to borrow the trial court's characterization, the perfunctory-and-self-evident principle suggests that if a trial court decides that an FRO is not needed to protect the victim from further abuse, it should be expected to articulate sound reasons to support its conclusion. See R. 1:7-4; Curtis v. Finneran, 83 N.J. 563, 570 (1980) ("Naked conclusions do not satisfy the purpose of [Rule] 1:7-4. Rather, the trial court must state clearly its factual findings and correlate them with the relevant legal conclusions."). It is not enough, in other words, for a court simply to state in a conclusory fashion that

29

the plaintiff has not shown the need for an FRO, or that the risk of further abuse is not immediate.

V.

INHERENT EGREGIOUSNESS OF ACQUAINTANCE RAPE

As we have noted, when applying the perfunctory-and-self-evident principle to the facts of specific cases, we must consider the severity of the predicate act, since the more egregious the unlawful conduct, the greater the need for protection from further abuse. At the risk of stating the obvious, forcible sexual assault in violation of N.J.S.A. 2C:14-2(c)(1)—violent conduct graded as a second-degree crime[13] and subject to enhanced punishment under NERA—is an especially egregious predicate act, amply sufficient to justify an FRO even in the absence of a pattern of past domestic violence. See Silver, 387 N.J. Super. at 128.

Aside from the physical trauma and emotional scarring that forcible sexual assault causes, the acquaintance rape in this case hearkens to stone age

---

[13] The trial court found that defendant committed nonconsensual sexual assault under circumstances where the victim did not sustain severe personal injury. See N.J.S.A. 2C:14-2(c)(1). Had the victim sustained severe personal injury, the offense would be graded as a first-degree crime. N.J.S.A. 2C:14-2(a)(6). We are satisfied the second-degree variety of forcible sexual assault constitutes a "sufficiently egregious action" within the meaning of Cesare and Silver.

30

attitudes regarding the subjugation of women as sex objects who were expected if not obliged to satisfy a man's sexual desires. Acquaintance rape, in other words, is an obvious if not extreme example of the kind of coercive control the PDVA does not tolerate. See R.G., 449 N.J. Super. at 228 (referring to misconduct "imbued by a desire to abuse or control the victim" (citing Silver, 387 N.J. Super. at 126-27)). The predicate act committed in this case thus falls squarely within the heartland of the type of control and domination the PDVA is designed to remediate and restrain.

In M.T.S., our Supreme Court traced the history of common law sexual assault laws, culminating in statutory reforms in which New Jersey played an important if not groundbreaking role. Justice Handler, writing for a unanimous Court, forcefully explained,

> Today the law of sexual assault is indispensable to the system of legal rules that assures each of us the right to decide who may touch our bodies, when, and under what circumstances. The decision to engage in sexual relations with another person is one of the most private and intimate decisions a person can make. Each person has the right not only to decide whether to engage in sexual contact with another, but also to control the circumstances and character of that contact. No one, neither a spouse, nor a friend, nor an acquaintance, nor a stranger, has the right or the privilege to force sexual contact.
>
> [129 N.J. at 446.]

A-3315-24

These criminal law reforms have a direct bearing on civil actions brought under the PDVA, which, as we have noted, is codified in the penal code and incorporates the code's substantive and definitional features. It bears noting that there was a time before the adoption of the penal code reforms when forcing a person in a domestic relationship to submit to sexual intercourse was socially acceptable, or at least beyond the reach of the law. For lack of a better characterization, the exercise of such control and domination by a man over his intimate partner was treated essentially as if it were a form of mere contretemps, not rising to the level of domestic violence. Cf. Silver, 387 N.J. Super. at 125 (explaining the PDVA is meant to address "matters of consequence" as distinguished from "ordinary domestic contretemps").

Relatedly, as explained in M.T.S., the law once instructed police, judges, and juries to be skeptical of rape victims and hostile to their claims. See M.T.S., 129 N.J. at 429-39. See also State v. Chambers, 252 N.J. 561, 585 (2023) (noting that the Sexual Assault Victim's Bill of Rights (SAVBR), N.J.S.A. 52:4B-60.2, explains that "victims of sexual violence in particular often face circumstances where they may be blamed for the crime, assumed to be fabricating the crime, or taken less seriously than their injuries warrant" (quoting N.J.S.A. 52:4B-60.2(b))). Those attitudes and policies emerged and

flourished in an extended era when men dominated the legal profession and set the rules for women to follow when sexually assaulted. The Court in M.T.S. emphasized that the penal code's reforms jettisoned such hoary principles as the need for victims to make a "hue and cry" or to show they resisted to the utmost before their allegations of sexual abuse would be countenanced. See M.T.S., 129 N.J. at 429-47. The reforms also rejected the notion that a man could not be guilty of raping his own wife. Id. at 438, 441. The adoption of the sexual assault provisions of the penal code was a watershed event, transforming our criminal rape laws and bringing them into the modern era. Especially considering the enactment of complementary statutes such as SAVBR and SASPA, we are convinced that our civil domestic violence laws, not just our substantive criminal laws, are no longer haunted by the ghosts of such archaic social attitudes and discredited legal policies.

## VI.

### STRANGULATION AS AN AGGRAVATING CIRCUMSTANCE

Aside from the egregiousness inherent in nonconsensual sexual penetration, the assaultive conduct in this case also involved strangulation. That form of physical violence likewise signals the kind of coercive control

that the PDVA is designed to forestall, even when it does not rise to the level of attempted murder or render the victim unconscious.[14]

Strangulation is a distinctive form of violence—one that can have not only severe physical consequences but severe psychological consequences as well. In People v. Reid, a criminal case charging domestic violence under California law, the court cited to the legislative history of a California bill for the proposition that:

> Prior to the research and recent focus on strangulation training programs and specialized intervention processes, this lethal violence was often minimized. In many cases, the lack of physical evidence caused the criminal justice system to treat "choking" cases as minor incidents, much like a slap to the face where only redness might appear. Today, based on the involvement of the medical profession, specialized training for police and prosecutors, and ongoing research, strangulation has become a focus area for policy makers and professionals working to reduce intimate partner violence and sexual assault.
>
> [25 Cal. Rptr. 3d 820, 827-28 (Cal. Ct. App. 2024).]

---

[14] See N.J.S.A. 2C:11-1(a), (b), and (d), defining "serious bodily injury" to include "protracted loss or impairment of the function of any bodily member or organ;" "significant bodily injury" to include "a temporary loss of the function of any bodily member or organ or temporary loss of any one of the five senses;" and "bodily injury" to include "physical pain . . . or any impairment of physical condition." As we explain, the penal code was amended in 2021 to make strangulation of a domestic violence victim a second-degree crime of aggravated assault notwithstanding the victim did not suffer significant bodily injury. See N.J.S.A. 2C:12-1(b)(13); L. 2021, c. 172, § 1.

In Commonwealth v. Moore, the Supreme Court of Kentucky recently noted in a similar vein,

> Strangulation is one of the most accurate predictors for the subsequent homicide of victims of domestic violence. Strangulation is the calling card of a serial rapist. The problem of intimate partner violence (IPV) is multifaceted, but experts agree there are few offenses as indicative of an intent to control, harm, and/or kill than strangulation. In fact, if a person is strangled even one time, the victim's chance of being killed by their abuser is increased by 750%.
>
> [709 S.W. 3d 241, 258 (2025) (quoting Office of the Kentucky Attorney General, Responding to Strangulation in Kentucky: Guidelines for Prosecutors, Law Enforcement, Health Care Providers, and Victim Advocates 5 (2025)).]

See also Supreme Court of Ohio, Domestic Violence & Allocation of Parental Rights and Responsibilities: Court Guide 2-3 (rev. 2023) (including strangulation in a list of "Lethality or Risk Factors" for purposes of allocating parental rights and responsibilities).

We note that the New Jersey Attorney General has also issued a statewide law enforcement directive instructing police and prosecutors on how to respond to this form of violence. See Off. of the Att'y Gen., Law Enf't Directive No. 2023-03, Directive Establishing Breathing/Blood flow Restriction Event: Advocacy, Treatment, Help, and Empowerment (BREATHE) Team (Aug. 21, 2023). The Directive highlights the dangers of

strangling and notes the predictive value of strangulation in assessing the risk of future violence.  Id. at 1.

When an assailant resorts to strangulation of a domestic partner, their immediate purpose may not be to kill but rather to assert physical dominance. In those instances, the actor is sending the message that they could kill the victim if they wanted to simply by tightening and maintaining their grip, but have chosen instead to release the stranglehold as an assertion of raw power— a nonverbal statement designed to foster fear and compel subservience.  That is a quintessential example of the kind of coercive control that lies at the heart of the domestic violence problem, and the kind of conduct that the PDVA is intended to restrain.[15]

It bears emphasis that in 2017, the Legislature amended the penal code to create a new variant of aggravated assault that deals specifically with strangulation of a domestic violence victim.  L. 2017, c. 240, § 1.  N.J.S.A. 2C:12-1(b)(13) provides that a person is guilty of aggravated assault if they

> [k]nowingly or, under circumstances manifesting extreme indifference to the value of human life,

---

[15]    See Dércio de Assis et al., Non-Fatal Strangulation Laws and Intimate Partner Homicides, IZA Institute of Labor Economics, July 2025, at 2 (finding that non-fatal strangulation "is an important risk factor for subsequent intimate partner homicide . . . and signals an escalation of violence and control within the relationship" (citations omitted)).

A-3315-24

recklessly obstructs the breathing or blood circulation of a person who, with respect to the actor, meets the definition of a victim of domestic violence, as defined in [N.J.S.A. 25-19(d)], by applying pressure on the throat or neck or blocking the nose or mouth of such person, thereby causing or attempting to cause bodily injury.

In 2021, the Legislature elevated this offense to a second-degree crime. L. 2021, c. 172, § 1. As a result, under the revised penal code, aggravated assault by strangulation as defined in N.J.S.A. 2C:12-1(b)(13) is a second-degree crime notwithstanding that the victim did not suffer significant bodily injury. Cf. N.J.S.A. 2C:12-1(b)(12) (making an assault a crime of the second degree if the actor causes significant bodily injury to a person who, with respect to the actor, meets the definition of a victim of domestic violence). See note 13.

The strangulation type of aggravated assault constitutes a predicate act under the PDVA, which, as we have noted, incorporates by reference the definitions and elements of the acts enumerated in N.J.S.A. 2C:25-19(a), including any type of "assault" under N.J.S.A. 2C:12-2. See N.J.S.A. 2C:25-19(a)(2). Although strangulation is not included in the non-exhaustive list of FRO factors enumerated in N.J.S.A. 2C:25-29(a)(1) to -29(a)(7), in view of the sentencing upgrade for this form of aggravated assault, the predictive value of strangulation, and the animating principle that the PDVA is intended to

provide domestic violence victims maximum protection, we hold that strangulation is a highly relevant circumstance bearing on a victim's need for an FRO.[16] Relatedly, we hold that while there are no automatic FROs under the PDVA framework, strangulation by itself can be a "sufficiently egregious action" so as to invoke the perfunctory-and-self-evident principle. See Silver, 387 N.J. Super. at 128. We add that in this case, the strangulation co-occurred with nonconsensual sexual penetration, amplifying immeasurably the overall level of physical force and egregiousness of the manner in which the predicate act was committed.

## VII.

## RISK ASSESSMENT OF FURTHER ABUSE

The second part of the Silver test, addressing the case-sensitive need for an FRO, necessarily entails an assessment of the risk of future harm to the victim. Unlike Criminal Part judges hearing pretrial detention hearings under the Criminal Justice Reform Act, N.J.S.A. 2A:162-15 to -26, who are provided with a detailed Public Safety Assessment that measures the risk of failure-to-

---

[16] We note that while it was alleged in plaintiff's TRO complaint, the trial court did not determine whether, in addition to sexual assault, defendant committed the predicate act of assault by strangulation. That circumstance does not foreclose the consideration of strangulation as a relevant factor in determining the need for an FRO under the second part of the Silver two-part test.

appear and new criminal activity, Family Part judges hearing domestic violence cases are not provided with a validated risk assessment tool or an evidence-based decision-making framework to inform their determination of the risk of further abuse or the need for court-ordered conditions such as a stay away/no contact order.[17]

Here, the trial court noted that defendant had "predatory tendencies." The court also found that plaintiff was "scared" and that her fear of defendant was "legitimate." See J.D. v. A.M.W., 475 N.J. Super. 306, 314 (App. Div. 2023) (holding that plaintiff's "fear of defendant and the prior history of domestic violence" were enough to satisfy the second Silver prong); P.B., 447 N.J. Super. at 409, 417 (holding an FRO was required where a physical assault left plaintiff "emotionally shaken" and caused her to fear further abuse). Cf. D.M.R. v. M.K.G., 467 N.J. Super. 308, 324 (App. Div. 2021) (reversing entry of an FRO in part because "[p]laintiff did not express fear of defendant" and

---

[17] We note that police and prosecutors have developed a tool for assessing domestic violence risks. See Off. of the Att'y Gen., Law Enf't Directive No. 2016-6 v3.0, Amended Directive Establishing Interim Policies, Practices, and Procedures to Implement Criminal Justice Reform Pursuant to P.L. 2014, c. 31 44 (Sept. 27, 2017) (designating the Ontario Domestic Assault Risk Assessment (ODARA) "as the risk assessment tool to be utilized by law enforcement officers in New Jersey to assist in identifying the risk of future assaults between intimate partners"). So far as we are aware, that instrument has not been adopted by the judiciary. See id. at 47 ("The Judiciary has made clear that it currently is not prepared to utilize the ODARA.").

A-3315-24

"the judge stated that he did not know whether plaintiff was afraid"). The court nonetheless concluded that plaintiff had not demonstrated that an FRO was necessary to protect her from "immediate danger." We disagree.

## A.

### Immediacy of Danger

The trial court's conclusion that an FRO was not needed to protect plaintiff from immediate danger may reflect a misunderstanding of what must be proved to justify an FRO. As we have noted, the trial court in its oral ruling stated, "I need to see immediate danger." There is another route, however, for establishing the second prong of the Silver test.

It is certainly true that one of the statutory FRO factors is "[t]he existence of immediate danger to person or property." N.J.S.A. 2C:25-29(a)(2). We stress, however, that this is not a categorical prerequisite to an FRO but rather a relevant factor, one of seven bearing on the second part of the Silver test. Cf. J.A.H, 463 N.J. Super. at 434 (recognizing that a history of domestic violence is only "one of six [now seven] non-exhaustive factors judges must consider when evaluating whether an FRO is necessary for a plaintiff's protection").

Furthermore, Silver explains that if the plaintiff satisfies the first prong by proving that a predicate act was committed, the court must next determine

whether an FRO is necessary to protect the plaintiff from "immediate danger or to prevent further abuse."  387 N.J. Super. at 127 (emphasis added).  See also N.J.S.A. 2C:25-29(a)(7) (stating with respect to the pattern of coercive control FRO factor that the trial court must "specifically consider[] evidence of the need for protection from immediate danger or the prevention of further abuse" (emphasis added)).  We presume the disjunctive formulation in both Silver and the recent statutory amendment was intentional.  Under the Silver paradigm, in other words, the need to prevent "further abuse" can suffice to justify an FRO even if the victim is not facing "immediate danger."

Relatedly, the goal of a permanent[18] FRO is to ensure not just immediate but long-term protection.  The PDVA, in other words, does not require proof of a threat so imminent that it would be expected to come to fruition instantaneously.  Cf. Cesare, 154 N.J. at 402 (specifically addressing the predicate act of terroristic threats, which is committed when a person "threatens to kill another with purpose to put [them] in imminent fear of death under circumstances reasonably causing the victim to believe the immediacy of

---

[18]  An FRO issued pursuant to the PDVA is permanent and does not have an expiration date, although there is a procedure to vacate an FRO without the victim's consent.  See Carfagno v. Carfagno, 288 N.J. Super. 424, 435 (Ch. Div. 1995) (enumerating eleven factors for a court to consider when deciding whether to vacate or modify an FRO).

the threat and the likelihood that it will be carried out" (quoting N.J.S.A. 2C:12-3(b))).

As we noted in Section VI, studies show that strangulation has predictive value in gauging the risk of future harm to a victim.  That circumstance alone, in our view, establishes an adequate risk of further abuse in this case.

Importantly, moreover, the "further abuse" contemplated in Silver need not be a carbon copy of the predicate act but might include other future interactions that would be harmful to a victim who has already been scarred and made vulnerable,[19] in this case, by egregious sexual violence.  At the risk of stating the obvious, an FRO would not be limited to enjoining rape but would include other instructions to protect the victim's wellbeing.  See N.J.S.A. 2C:25-29(b) ("In proceedings in which complaints for restraining orders have been filed, the court shall grant any relief necessary to prevent further abuse.").  Here, plaintiff sought an FRO that would, in part, prohibit defendant "from having any oral, written, personal, electronic, or other form of contact or communication with" her.  Such contact, if made deliberately,

---

[19]  See Chambers, 252 N.J. at 584 (noting "[o]ur courts have recognized that, in sexual assault cases, 'the wellbeing of . . . victims demands heightened protection' because there is a 'likelihood of emotional trauma and mental distress.'" (quoting State v. D.R.H., 127 N.J. 249, 259 (1992))).

would itself constitute further abuse.  <u>See</u> N.J.S.A. 2C:25-19(a)(17) (making contempt of a PDVA order a predicate act of domestic violence).

B.

<u>Other Circumstances Relied on by the Trial Court</u>

Aside from citing the lack of any previous history of domestic violence, the only findings made by the trial court that might support its conclusion that there was no immediate danger to defendant are (1) that "[defendant] understands that that's not the kind of conduct of how a man should treat a woman" and (2) the parties live in different towns.  We address each of these circumstances in turn.

1.

*Remorse as a Mitigating Circumstance*

As to the trial court's comment that defendant now "understands that that's not the kind of conduct of how a man should treat a woman," the court appears to have been referring to the fact that defendant apologized to plaintiff for his conduct before the sexual assault, and while driving her home after the assault, acknowledged that "he felt he did something bad."  We recognize that remorse, if genuine, might conceivably be a relevant consideration in predicting future behavior and the likelihood of recidivism, <u>cf.</u> N.J.S.A. 2C:44-1(b)(9) (establishing as a sentencing mitigating factor that "[t]he character and

43

attitude of the defendant indicate that the defendant is unlikely to commit another offense"). Here, however, we are not persuaded that defendant's purported apology reasonably suggests that he has since come to appreciate how a man should "treat a woman," to borrow the trial court's phrasing. Rather, defendant's post-assault apology is as likely to have been an attempt to convince plaintiff not to press criminal charges or to seek a PDVA restraining order.[20]

We add that defendant had also expressed remorse to plaintiff after their second date—a circumstance that did not dissuade him from taking sexual advantage of plaintiff on the third and fateful date. And in any event, we presume that defendant knew all along that sexual penetration achieved by overpowering a protesting victim is unlawful. In these circumstances, any remorse defendant may have expressed to the victim, or tacitly implied to the court when he acknowledged he had received a "break," is not a legitimate basis to deny an FRO, especially given the court's concurrent observation that defendant has "predatory tendencies."

---

[20] We note that defendant preemptively reported his version of events to police before plaintiff applied for a TRO. Accusing plaintiff of unlawful sexual contact does not strike us as remorseful or otherwise indicative of a pledge not to repeat the unlawful conduct—which defendant denied at trial— that the court found he committed. As we have noted, the record does not indicate how police responded to defendant's report. See note 3.

## 2.

### *Likelihood of Future Encounters*

The trial court's finding that the parties live in different towns, while supported by the record, is by no means conclusive on the likelihood that the parties will interact in the future considering other facts in the record. The trial court acknowledged that both parties would be attending the same college in the fall. And while the court did not make explicit findings, plaintiff, whom the court found to be credible, presented undisputed evidence that defendant knows where she works and where she lives, having picked her up and dropped her off at her home. See J.A.H., 463 N.J. Super. at 436 (noting that the defendant's knowledge of plaintiff's address "provided another reason substantiating [the] plaintiff's fear of [the] defendant"). Plaintiff likewise testified that she and defendant have similar social circles and that she had already missed several softball games "because [she] knew [defendant] was going to be there and . . . didn't feel safe."

But lest there be any doubt about whether plaintiff adequately established the risk of future contact and further abuse, the trial court concluded its oral decision by addressing defendant directly, telling him, "[y]ou understand that when you see her around in the fall, you're going to turn

the other way" (emphasis added).  As we have noted, this colloquy contradicts the court's conclusion that an FRO was not necessary.

We find instructive guidance on this point in our decision in A.M.W.  In that case, the trial court declined to enter an FRO but directed the parties to maintain twenty yards' distance between them at their son's sporting events going forward.  475 N.J. Super. at 312.  We reversed and remanded for entry of an FRO, specifically highlighting this instruction by the trial court as evidence of the ongoing need for a restraining order.  Id. at 315.  Here, too, the trial court's remark further indicates that an FRO was necessary.

VIII.

CONSIDERATION OF THE BEST INTERESTS OF THE VICTIM

We next consider the implications of the trial court's failure in its oral ruling to explicitly consider the "best interests of the victim," which is one of the enumerated statutory factors.  N.J.S.A. 2C:25-29(a)(4).  Although, as we have noted repeatedly, the statutory FRO factors are not required elements, they must be considered.  See C.R. II, 257 N.J. at 143-44 (noting that under the PDVA, courts "shall" consider each statutory factor (quoting N.J.S.A. 2C:25-29(a))); Silver, 387 N.J. Super. at 127 (holding that the FRO determination should be made "upon an evaluation of the factors set forth in [the PDVA]").  We deem the absence of any explicit consideration of plaintiff's best interests

46

to be a serious deficiency in the trial court's rationale because on these facts, plaintiff's best interests militate strongly in favor of granting her request for an FRO.

We reiterate and stress that "[o]ur law is particularly solicitous of victims of domestic violence." M.D.F., 207 N.J. at 473 (alteration in original) (quoting Hoffman, 149 N.J. at 584). We add that Article I, Paragraph 22 of the New Jersey Constitution expressly provides that "[a] victim of a crime[21] . . . shall be entitled to those rights and remedies as may be provided by the Legislature." Beyond the rights granted to all crime victims, New Jersey law confers additional rights upon victims of sexual assaults. See, e.g., SAVBR, N.J.S.A. 52:4B-60.2; State v. Ramirez, 252 N.J. 277, 299-303 (2022) (detailing the legislatively established rights for sexual assault victims). See also Chambers, 252 N.J. at 584 ("Our courts have recognized that, in sexual assault cases, 'the wellbeing of . . . victims demands heightened protection' because there is a 'likelihood of emotional trauma and mental distress.'" (quoting D.R.H., 127 N.J. at 259)).

---

[21] Our State Constitution explains that the term "victim of a crime" includes "a person who has suffered physical or psychological injury or has incurred loss of or damage to personal or real property as a result of a crime." N.J. Const. art. I, ¶ 22.

Considering these basic legislative findings and principles and applying them in concert with the PDVA's best-interests-of-the-victim factor, we are satisfied that plaintiff has a protectable interest in attending college without having to fear future contact with the man who exploited their truncated dating relationship and forcibly penetrated her against her will. See Hoffman, 149 N.J. at 584 ("At its core, the [PDVA] effectuates the notion that the victim of domestic violence is entitled to be left alone. To be left alone is, in essence, the basic protection the law seeks to assure these victims."). That is especially so considering defendant's persistence in wanting to have sexual intercourse with plaintiff and the court's acknowledgment that defendant has predatory tendencies.

We are not suggesting that defendant should be precluded from attending the college of his choice. Rather, the point is that plaintiff has the right in these circumstances to know that when she encounters defendant at school or while socializing with friends, she will be protected by a formal FRO and all associated enforcement rights available under the PDVA and not just by the informal scolding the judge gave to defendant at the end of the hearing.

IX.

INHERENT LIMITS ON THE EXERCISE OF JUDICIAL DISCRETION

48

Finally, we would be remiss if we did not comment on the trial court's concluding remark to defendant, announced in the presence of the victim: "[d]o you understand the break you got today?" That comment is troubling if for no other reason than it might lead plaintiff to believe that the court's decision was based on defendant's best interests, rather than hers. Aside from disregarding the best-interests-of-the-victim factor and the PDVA's overarching protective purpose, the court's final remark falls short of treating a sexual assault victim with fairness, compassion and respect. See N.J. Const. art. I, ¶ 22.

We appreciate the reality that some domestic violence defendants do indeed get a windfall benefit when, for example, a plaintiff exercises their prerogative to withdraw their FRO complaint.[22] But it is not a court's

_____

[22] Unlike criminal cases that are brought by prosecutors, in civil cases, including TRO/FRO actions brought under the PDVA, domestic violence victims as plaintiffs have the authority to withdraw their complaints, in which event the court has no choice but to dismiss the action. Much has been written on the circumstances associated with the "cycle of violence" that may induce domestic violence victims to recant or otherwise dismiss viable claims. See, e.g., Jane Stoever, Transforming Domestic Violence Representation, 101 Ky. L.J. 483, 506-07, 523 (2013) (noting that under the "Cycle of Violence" model, "the abuser's contrition and remorse . . . encourage the survivor to hope the abuser will change and prompt [the survivor] to stay in the relationship," and observing that "as many as half of domestic violence survivors" dismiss or seek to vacate their protective orders); see also C.R. II, 257 N.J. at 158 (Fasciale, J., concurring) (noting that a PDVA FRO is "geared towards ending the cycle of domestic violence").

A-3315-24

prerogative to extend a "break," either in deciding whether a predicate act of domestic violence was proven or whether to grant the plaintiff's request for an FRO. If the facts as found by the trial court warrant an FRO applying the burden of persuasion, standard of proof, and other governing legal principles, an FRO should be issued consistent with the foundational principle that the PDVA is intended "to assure the victims of domestic violence the maximum protection from abuse the law can provide." N.J.S.A. 2C:25-18; G.M., 453 N.J. Super. at 12. If, in contrast, the facts as found by the trial court do not establish the grounds or need for an FRO, meaning that the plaintiff has not carried their burden of persuasion under the PDVA, the application should be denied and the PDVA complaint dismissed. Stated another way, while we extend substantial deference to Family Part judges in deciding domestic violence disputes, that discretion does not include the authority to extend a break or favor to either party.

In this instance, once the trial court made its credibility findings, credited plaintiff's testimony, found that defendant committed forcible acquaintance rape and strangled the victim, and acknowledged the parties might run into each other at school, the decision on whether to issue an FRO became perfunctory and the need for the protection of an FRO self-evident.

We therefore reverse and remand for the court to enter an FRO. We do not retain jurisdiction.

We conclude by emphasizing that in describing the disturbing facts in this case, we do not mean to imply that physical violence less severe than the harm inflicted on plaintiff would not be "sufficiently egregious" to invoke the perfunctory-and-self-evident principle. The key point is that whenever the predicate act involves physical violence, the type and degree of that violence is a variable that must be accounted for under the second prong of the Silver test.

Reversed and remanded for proceedings consistent with this opinion.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3315-24